# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

ROBERT FRAZIER; ANIBAL HERNANDEZ; D.P., a minor, by and through his next friend and guardian, K.P.; CHRISTOPHER BUTLER; MIRAMBA WILLIAMS; DONNELL DAVIS; LESLIE SHARP; ELMER LAGUAN-SALINAS; and ADRIENNE WORTHINGTON, individually and on behalf of a class of similarly situated persons,

*Plaintiffs-Appellants*,

v.

PRINCE GEORGE'S COUNTY, MARYLAND; CORENNE LABBÉ, in her official capacity as Director of the Prince George's County Department of Corrections; JEFFREY LOGAN, in his official capacity as Division Chief of the Prince George's County Population Management Division; KENNETH GRAY, in his official capacity as Section Chief of the Prince George's County Community Supervision Section; TANYA LAW, in her official capacity as Unit Chief of the Prince George's County Monitoring Services Unit; LAKEECIA ALLEN; BRYON BEREANO; JOHN BIELEC; SCOTT CARRINGTON; ADA CLARK-EDWARDS; STACEY COBB SMITH; BRIAN DENTON; ROBERT HEFFRON, JR.; DONNAKA LEWIS; GREGORY POWELL; CATHY SERRETTE, in their personal capacities and official capacities as District and Circuit Court Judges for the District and Circuit Courts of Maryland for Prince George's County,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, Case No. 8:22-cv-01768
Before the Honorable Peter J. Messitte

## OPENING BRIEF OF APPELLANTS

(counsel listed on next page)

Jeremy D. Cutting
Sumayya Saleh
Jeffrey D. Stein
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW
Suite 800
Washington, D.C. 20009
Phone: (202) 894-6132
cody@civilrightscorps.org

Elizabeth R. Cruikshank
Mary B. McCord
William Powell
Seth Wayne
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY AND PROTECTION
GEORGETOWN UNIVERSITY
    LAW CENTER
600 New Jersey Ave. NW
Washington, D.C. 20001
Phone: (202) 662-9042
erc56@georgetown.edu

Howard M. Shapiro
Matthew T. Martens
Sonika Data
Britany Riley-Swanbeck
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Phone: (202) 663-6487
howard.shapiro@wilmerhale.com

Robert L. Boone
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Phone: (212) 230-8800
robert.boone@wilmerhale.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ....................................................ix

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION ........................................................................3

STATEMENT OF THE ISSUES ON APPEAL .........................................................3

STATEMENT OF THE CASE................................................................................4

    I.    Factual Background .........................................................................4

        A.  Judge Defendants delegate pretrial release and detention
             decisions to an agency of Prince George's County. ..............................4

        B.  The Pretrial Division renders pretrial detention decisions
             subject to its own criteria, without judicial control, public
             transparency, or procedural protections..................................................7

        C.  Because of Defendants' outlier pretrial detention practices,
             hundreds of people who are judicially authorized for release
             remain in jail...........................................................................................11

    II.   Procedural History .........................................................................15

SUMMARY OF ARGUMENT................................................................................18

STANDARD OF REVIEW ...................................................................................19

ARGUMENT ....................................................................................................20

    I.    Prince George's County is not quasi-judicially immune............................20

        A.  Quasi-judicial immunity is available only to individual
             officers sued in their personal capacities for damages
             and is categorically unavailable to the County.....................................20

        B.  Even if quasi-judicial immunity were available to municipalities,
             quasi-judicial immunity does not apply to the County's
             unconstitutional policies and practices in this case..............................23

    II.   The County is not immune from injunctive relief. .....................................29

    III. Defendants are not immune from declaratory relief. .................................33

    IV. The transitory nature of the putative injunctive class protects the
        named Plaintiffs' class-wide equitable claims from becoming moot. .......38

V.   Plaintiffs are entitled to relevant non-privileged testimony from Judge
     Defendants. .................................................................................................40

CONCLUSION ...................................................................................................47

CERTIFICATE OF COMPLIANCE.................................................................49

CERTIFICATE OF SERVICE............................................................................50

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Quarles,*
92 F.2d 321 (4th Cir. 1937) .......................................................................36

*Al Otro Lado, Inc. v. Wolf,*
No. 17-CV-2366, 2020 WL 4336064 (S.D. Cal. July 27, 2020) .............................44

*Alkire v. Irving,*
330 F.3d 802 (6th Cir. 2003) .....................................................................22

*Antoine v. Byers & Anderson,*
508 U.S. 429 (1993) ................................................................................24

*Bauer v. Texas,*
341 F.3d 352 (5th Cir. 2003) .....................................................................31

*Berkley v. Common Council of City of Charleston,*
63 F.3d 295 (4th Cir. 1995) ......................................................................21

*Bolin v. Story,*
225 F.3d 1234 (11th Cir. 2000) ..................................................................31

*Bradley v. Fisher,*
80 U.S. 335 (1871) ............................................................................21, 29

*Burbach Broad. Co. of Del. v. Elkins Radio Corp.,*
278 F.3d 401 (4th Cir. 2002) .....................................................................19

*Burns v. Reed,*
500 U.S. 478 (1991) ................................................................................24

*Bush v. Rauch,*
38 F.3d 842 (6th Cir. 1994) ......................................................................24

*Butz v. Economou,*
438 U.S. 478 (1978) ............................................................................26, 32

*Cain v. City of New Orleans,*
184 F. Supp. 3d 379 (E.D. La. 2016) ...........................................................31

*Cain v. City of New Orleans,*
281 F. Supp. 3d 624 (E.D. La. 2017) ...........................................................35

*Cain v. City of New Orleans,*
No. 15-CV-4479, 2016 WL 7156071 (E.D. La. Dec. 8, 2016) ........................41, 42

*Caliste v. Cantrell,*
    329 F. Supp. 3d 296 (E.D. La. 2018) ........................................35

*Capra v. Cook Cnty. Bd. of Rev.,*
    733 F.3d 705 (7th Cir. 2013) ...............................21, 22, 23

*Centro Tepeyac v. Montgomery County,*
    722 F.3d 184 (4th Cir. 2013) ...............................37

*Ciarlone v. City of Reading,*
    263 F.R.D. 198 (E.D. Pa. 2009) ...............................41

*Cleavinger v. Saxner,*
    474 U.S. 193 (1985) ...............................26, 33

*Colorado River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976) ...............................37

*County of Riverside v. McLaughlin,*
    500 U.S. 44 (1991) ...............................38, 39

*Edwards v. City of Goldsboro,*
    178 F.3d 231 (4th Cir. 1999) ...............................19, 23, 25

*Feltz v. Bd. of Cnty. Comm'rs of Cnty. of Tulsa,*
    No. 18-CV-298, 2020 WL 2039250 (N.D. Okla. Apr. 28, 2020) .................... 43, 47

*Foster v. Fisher,*
    694 F. App'x 887 (4th Cir. 2017) ...............................31, 35

*Fowler v. Alexander,*
    478 F.2d 694 (4th Cir. 1973) ...............................34

*Frazier v. Prince George's County,*
    86 F.4th 537 (4th Cir. 2023) ...............................17, 29, 40

*Garcia v. County of Riverside,*
    817 F.3d 635 (9th Cir. 2016) ...............................22

*Gerstein v. Pugh,*
    420 U.S. 103 (1975) ...............................38, 39

*Gibson v. Goldston,*
    85 F.4th 218 (4th Cir. 2023) ...............................28, 31, 32

*Gilmore v. Bostic,*
    636 F. Supp. 2d 496 (S.D. W. Va. 2009) ...............................22

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) .......................................................37

*Goluszek v. H.P. Smith Paper Co.*,
No. 93 C 5329, 1993 WL 358160 (N.D. Ill. Sept. 14, 1993) ...................22

*Gross v. Rell*,
695 F.3d 211 (2d Cir. 2012) .......................................................29

*Hernandez v. Sheahan*,
455 F.3d 772 (7th Cir. 2006) .......................................................21

*Hickman v. Taylor*,
329 U.S. 495 (1947) .......................................................45

*In re Certain Complaints*,
783 F.2d 1488 (11th Cir. 1986) ......................... 41, 42, 43, 47

*In re Enf't of Subpoena*,
972 N.E.2d 1022 (Mass. 2012) .......................................................43

*In re Grand Jury Proceedings*,
33 F.3d 342 (4th Cir. 1994) .......................................................44

*In re Grand Jury, John Doe No. G.J.2005-2*,
478 F.3d 581 (4th Cir. 2007) .......................................................19

*In re Mills*,
287 F. App'x 273 (4th Cir. 2008) ......................... 23, 25

*Jonathan R. ex rel. Dixon v. Justice*,
41 F.4th 316 (4th Cir.)......................................................40

*Just. Network Inc. v. Craighead County*,
931 F.3d 753 (8th Cir. 2019) .......................................................31

*Kava Holdings, LLC v. Rubin*,
No. 16-CV-6955, 2016 WL 6652706 (C.D. Cal. Nov. 10, 2016) ............44

*Kentucky v. Graham*,
473 U.S. 159 (1985) .......................................................21

*Kimberly Regenesis, LLC v. Lee County*,
64 F.4th 1253(11th Cir. 2023).......................................................22

*Kincaid v. Vail*,
969 F.2d 594 (7th Cir. 1992) .......................................................23

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit,*
507 U.S. 163 (1993) ...................................................................21

*Livingston v. Guice,*
68 F.3d 460 (4th Cir. 1995) ...................................................32

*Minter v. Wells Fargo Bank, N.A.,*
258 F.R.D. 118 (D. Md. 2009) ..............................................41

*Mireles v. Waco,*
502 U.S. 9 (1991) ...................................................................24

*Monell v. Dep't of Soc. Servs.,*
436 U.S. 658 (1978) ..........................................................20, 21

*Moore v. Urquhart,*
899 F.3d 1094 (9th Cir. 2018) ..........................................31, 33

*Nollet v. Justs. of the Trial Ct.,*
83 F. Supp. 2d 204 (D. Mass. 2000) .....................................31

*Owen v. City of Independence,*
445 U.S. 622 (1980) ..........................................................20, 21

*Owens v. Balt. City State's Att'ys Off.,*
767 F.3d 379 (4th Cir. 2014) .................................................21

*Pulliam v. Allen,*
466 U.S. 522 (1984) ...................................................30, 34, 35

*Ralston Purina Co. v. McFarland,*
550 F.2d 967 (4th Cir. 1977) .................................................45

*Salter v. Upjohn Co.,*
593 F.2d 649 (5th Cir. 1979) .................................................41

*Sosna v. Iowa,*
419 U.S. 393 (1975) ..........................................................38, 39

*Sprint Comm'ns, Inc. v. Jacobs,*
571 U.S. 69 (2013) .................................................................37

*Stump v. Sparkman,*
435 U.S. 349 (1978) ..........................................................21, 29

*Sup. Ct. of Va. v. Consumers Union, Inc.,*
446 U.S. 719 (1980) ..........................................................29, 33

*Timmerman v. Brown,*
    528 F.2d 811 (4th Cir. 1975) ...................................................34

*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.,*
    229 F.3d 478 (5th Cir. 2000) ..................................................22

*U.S. Parole Comm'n v. Geraghty,*
    445 U.S. 388 (1980) ........................................................38, 39

*United States v. Bryan,*
    339 U.S. 323 (1950) ...............................................................41

*United States v. Lake Cnty. Bd. of Comm'rs,*
    233 F.R.D. 523 (N.D. Ind. 2005) ......................................43, 47

*United States v. Morgan,*
    313 U.S. 409 (1941) ...........................................................46, 47

*United States v. Nixon,*
    418 U.S. 683 (1974) ...............................................................41

*United States v. Roebuck,*
    271 F. Supp. 2d 712 (D.V.I. 2003) ........................................43

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.,*
    386 F.3d 581 (4th Cir. 2004) ..................................................36

*Ward v. City of Norwalk,*
    640 F. App'x 462 (6th Cir. 2016) ...........................................35

*Xactware Sols., Inc. v. Buildxact Software Ltd.,*
    95 F.4th 810 (4th Cir. 2024) ..................................................19

*Younger v. Harris,*
    401 U.S. 37 (1971) .................................................................37

**Statutes**

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 1331 ........................................................................3

28 U.S.C. § 1367 ........................................................................3

28 U.S.C. § 2201 ........................................................................3

42 U.S.C. § 1983 .................................................... 3, 30, 35, 36

## Rules

Fed. R. Civ. P. 12(b)(6) ..................................................................19

Fed. R. Civ. P. 12(c) .......................................................................19

Fed. R. Civ. P. 26(b)(1) ...................................................................44

Fed. R. Evid. 401 .............................................................................44

Md. Rule 4-216.1 .............................................................................29

## Treatises

8A Fed. Prac. & Proc. Civ. § 2037 (3d ed.) (June 2024 update) ......................................41

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument. This appeal involves several discrete issues and a complex record, and the Court would benefit from oral argument.

# INTRODUCTION

The pretrial detention hearing that follows someone's arrest is a momentous fork in the road. Whether a judge determines that it is necessary to keep a presumptively innocent person in jail pending trial will have outsized implications for that person's family and children, housing, employment, health, access to counsel, outcome of the criminal accusations against them, and even future criminal involvement, to say nothing of the public expenditures on pretrial incarceration. For this reason, federal and state law require these life-changing decisions to be made in a timely fashion by impartial judicial officers in open court, and with heightened procedural protections to guard against the mistaken deprivation of liberty.

In Prince George's County, however, a different system has emerged that is unlike anywhere else. There, state judges dodge public and political scrutiny for many of the release decisions assigned to them by law. Instead, for hundreds of people each year, judges authorize release, but then leave the final decision of whether or not to effectuate it up to a county government agency. This executive agency delays for weeks as it works behind closed doors and outside any adversarial legal proceeding, applying county policy to determine if it agrees with the judge that the person may be released. Ultimately, the agency often denies release for its own arbitrary and ever-shifting reasons. As a result, presumptively innocent people who been authorized to go free after an adversarial proceeding before a judge remain in jail for weeks or months for reasons later determined by the pretrial agency but never ordered by a judge: for

example, because they cannot procure a mortgage document to prove they live at their home, because they are unhoused, because they live in a neighboring county, because their accuser does not want them to be released, or because the county agency takes a different view from the judge and believes the accusations against the person are too serious. Plaintiffs allege that these county policies, as well as the judges' delegation of authority to the County, violate Plaintiffs' constitutional rights to due process.

The district court has not reached these serious merits questions, instead holding that judicial and quasi-judicial immunity bar Plaintiffs' claims against both the judges and the County. That holding is wrong in every respect and violates at least three black-letter legal principles. Decades of Supreme Court precedent establishes that (1) quasi-judicial immunity is a personal protection unavailable to a municipality like Prince George's County for any form of relief; (2) the County has no immunity or other protection from Plaintiffs' claims for *injunctive* relief; and (3) no party is immune from declaratory relief.

Additionally, the district court committed reversible errors when it failed to apply the "inherently transitory" mootness exception to putative representatives of the equitable-relief class, and when it quashed Plaintiffs' subpoenas seeking relevant, non-privileged testimony from state court judges about their administrative policies. This Court should reverse the district court's errors, and reinstate Plaintiffs' claims so that this important case can proceed to the merits.

## STATEMENT OF JURISDICTION

Plaintiffs brought this civil rights action under 42 U.S.C. § 1983, 28 U.S.C. § 2201 *et seq.*, the Fourteenth Amendment to the United States Constitution, and Maryland state law. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1367 & 2201.

This is an appeal of the district court's March 29, 2024 final order dismissing Plaintiffs' claims, as well as prior non-final orders encompassed therein. JA526, JA1209, JA1344, JA1537. Plaintiffs timely filed a notice of appeal on April 26, 2024. JA1539. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES ON APPEAL

1. Whether the personal defense of quasi-judicial immunity is available to a municipality.

2. Whether quasi-judicial immunity applies to claims seeking injunctive relief.

3. Whether judicial or quasi-judicial immunity applies to claims seeking declaratory relief.

4. Whether the claims of named Plaintiffs challenging pretrial detention are inherently transitory, such that they may continue to serve as class representatives after their individual cases become moot.

5. Whether judicial deliberative process privilege wholly prevents Plaintiffs from obtaining any deposition testimony about any relevant matter from Judge Defendants.

I.    **Factual Background**

    A. **Judge Defendants delegate pretrial release and detention decisions to an agency of Prince George's County.**

As Plaintiffs allege in this lawsuit, Prince George's County's bail determinations are unlike those in any other jurisdiction. There, judges routinely authorize arrested people for pretrial release but refrain from actually releasing them, instead delegating the final decision to the pretrial services agency—a division of the County's executive branch housed within its jail. Over a period of weeks or months during which the person remains jailed, the agency considers whether to release or detain based on internally devised policies, which it applies behind closed doors without counsel, argument, evidence, confrontation, findings, deadlines, or an explanation of reasoning. As a result, hundreds of presumptively innocent people are detained every day; not by the decision of a judge in open court, but that of unaccountable county policymakers and agency employees applying those policies in a dark room.

When a person is arrested in Prince George's County, they are brought before a judicial commissioner who issues an initial bail order. *See* JA28. If the person remains detained following this initial appearance, they appear before a district court judge for a bail review hearing on the next business day. JA28. At the hearing, the judge reviews the statement of charges, any evidence presented, and a pretrial "Intake Fact Sheet" prepared by the Population Management Division of the Prince George's County

Department of Corrections ("the Pretrial Division" or "the Division"), which lists, *inter alia*, the person's address, any criminal history, and prior court appearance record. JA29. A representative from the Pretrial Division is generally on-call for or present at bail review hearings, which typically last only a few minutes. JA29.

Here is where the process in Prince George's County diverges from other jurisdictions. In most counties across Maryland and beyond, as well as in the federal system, judges make a bail determination for each person who appears before them. *See, e.g.*, JA523–524 (describing practices in Montgomery County). The judge assesses the evidence and determines, in a public, adversarial, and on-the-record proceeding, whether any conditions of release can reasonably protect the government's compelling interests in safety and against flight or whether pretrial detention is necessary because no less-restrictive alternatives will protect those interests. JA523–524. During that hearing, a judge may consult a pretrial services agency for its recommendation concerning release conditions, but the decision remains with the judge, to be made based on a public record. JA524. At the conclusion of the hearing, the judge issues an order setting bail (*i.e.*, releasing the person on various conditions of release) or detaining the person without bail. JA523–524.

In Prince George's County, however, judges routinely avoid the political scrutiny of deciding, in a public setting, whether an arrested person poses an immitigable risk that justifies long-term pretrial detention. Instead, for as many as a quarter of the people who appear before them, the judges delegate the decision of whether and when a person

will be released. JA41–42. After making a preliminary decision about conditions of release, the judges issue a "pretrial order" or "pretrial option" (collectively, "pretrial release authorizations"). Those decisions authorize the jail to release a person *with no further judicial proceedings* or involvement, but grant the County's Pretrial Division, an executive agency, unfettered discretion to decide whether (and when) release actually occurs.[1] *See, e.g.,* JA31–32.[2] These authorizations form the basis for this lawsuit.

When a judge authorizes pretrial release of a person, the file is sent to the Pretrial Division, which decides whether, when, and on what conditions to release the person before trial. JA32. The person remains in jail until the Division applies its policies and makes its decision (weeks or months later in its discretion), and thereafter should the Division decide not to release. Pretrial release authorizations thus outsource one of the most important decisions in any criminal case—whether a presumptively innocent person will be preventively detained awaiting trial—to unaccountable, non-judicial county policymakers.

---

[1] Despite the terminology, Defendants aver that there is no significance to the distinction between an "option" and an "order." *See, e.g.,* JA417.

[2] *See also, e.g.,* JA41, JA131 (1,208 pretrial release authorizations given from Dec. 2018 to Feb. 2021).

## B. The Pretrial Division renders pretrial detention decisions subject to its own criteria, without judicial control, public transparency, or procedural protections.

Once a judge delegates the decision of when and whether to release a person to the Pretrial Division, the process becomes opaque. The Division operates on its own timeline in deciding whether to release a person. Presumptively innocent people in Prince George's County regularly wait for weeks, if not months, for the Pretrial Division to *decide* whether they will be released. JA33; *e.g.*, JA808–809 (nearly six weeks between Plaintiff D.P.'s pretrial authorization and the Division's notification that it would not release).[3] During this time, no court has found that no conditions exist that would protect the government's interests; in fact, by authorizing the Division to release in its discretion and pursuant to conditions it determines, the court has necessarily determined that *some* conditions of release determined by the Pretrial Division could satisfy the government's interests. Nevertheless, these individuals remain detained.

Unlike a judge making a decision at a court hearing, county employees decide each case behind closed doors in the Division's offices based on policies promulgated by county officials. JA32, JA34. No notice is provided about what factors are considered or why, no defense counsel or prosecutor is present, no adversarial hearing occurs, no opportunity exists to present or rebut evidence, and no record is made. JA34; *see, e.g.*,

---

[3] *See also* JA194 (identifying 80 people still detained whom judges had authorized for release more than a month prior, 48 of whom had been authorized more than three months prior).

JA144–145. The Pretrial Division does not volunteer any information to either the detained person or their counsel as to what investigation (if any) is happening, where the person is in the agency's processing queue, what information a person could provide to influence the decision, or when they can expect a decision. JA34; *see, e.g.*, JA88–89. The only way to attempt to learn a detained person's status or influence the decision is to contact the Pretrial Division, JA34; *see, e.g.*, JA80–81, which routinely refuses to respond, JA34; *see, e.g.*, JA115–116. During this time, people whom judges have authorized for release remain detained because of the Division's policies, often until their criminal cases end. *See, e.g.*, JA116 ("The vast majority of my clients given a pretrial order or option are never told definitively by the Pretrial Division that they will not be released, or why they are not being released.").

At the conclusion of its "processing," if the County decides that "a defendant [has] qualified for pre-trial release based on the criteria established by the PGCDOC," the defendant is released from jail without involvement of a judge. JA384; JA32. But the County ultimately refuses to release a large proportion of people whose release a judge has authorized.[4] They are the Plaintiffs in this lawsuit.

The Pretrial Division "sets and administers the criteria for pretrial release." JA383. The Pretrial Division's release eligibility criteria are its own; they were created

---

[4] *See* JA131 (identifying 246 people whose release determinations were delegated to the Pretrial Division between Dec. 2018 to Mar. 2021 but who were not released by the Division); JA42 (as of July 15, 2022, about half of people referred to pretrial between Jan. and May 2022 remained in jail, including a third of people given pretrial orders).

by county officials with no judicial involvement. JA32. The Division has established four "levels" of pretrial release, which have escalating conditions and supervision requirements. JA32–33. The authorizing judge may designate a specific level at which a person may be released; if not, the Division decides, using its self-determined criteria, at what level to release the person. JA32–33. The Division can and does, within its sole discretion, decline to release authorized persons based on these self-determined criteria; as the Chief of the Pretrial Division explained, "it is universally understood that the DOC will conduct an investigation and ultimately determine whether a detainee may participate in the pretrial-release program." JA417.

The Division is not required to provide a reason to the detained person or the court for its refusal to release an authorized person. *See, e.g.*, JA115–116. When a reason is provided, it is often arbitrary and unrelated to evidence about public safety or risk of flight—for instance, that a person has an address outside Prince George's County, the Division has not been able to contact the complaining witness, or that the person tested positive for COVID-19. *See* JA35–38, JA87–88, JA145–148, JA185 (listing the most common "policies" for denying release). Other typical reasons are based on the Division's application of its policies to facts already presented and considered by the court when it authorized release. JA35–36; *see* JA123 (describing denials based on policies relating to criminal history or the nature of the allegations). The Pretrial Division also refuses, as a matter of policy, to "release" individuals who have open warrants from other jurisdictions, preventing them from resolving or obtaining release

in other matters. JA37; *see, e.g.*, JA188. This is true even when the warrant issued because the Division's own delays caused the person to miss a court date in another jurisdiction. JA37; *see* JA188.

As a matter of policy, the Division regularly re-delegates the release decision to another non-judicial, non-neutral party: the complaining witness. JA36. The Division attempts to contact the complaining witness and requires indefinite detention if it is unable to reach the witness, or the witness says they do not want the person released. JA36. The Division does this even when the court considered the witness's input at the judicial hearing authorizing release. JA36; *see* JA146–147.

When the Pretrial Division decides not to release a person, it sends a form letter to the person's counsel. That letter rarely provides any information about the Division's decision. JA35. The letter includes several pre-printed reasons the Division might decline to release a person. In many cases, the Division checks only the last box: "Other–See Explanation." *See, e.g.*, JA202, JA206. The "explanation" provided is often just an instruction to contact the Pretrial Division for additional information. JA202, JA206.

The County—not the Judges—"exercises complete control over the release consideration process." JA145. For example, in March 2023, in response to this lawsuit, the Division modified an internal policy regarding its release decisions. Where it had previously not given itself any timeline for making release determinations, it stated that it would subsequently start making Level 4 release determinations within two weeks.

*Compare* JA123–124, *with* JA1317. During this litigation, the County has repeatedly stated that it could unilaterally "discontinu[e] its pretrial release program as nothing prevents it from doing so." JA402.

Defense attorneys regularly attempt to raise concerns with the County's policies in court. JA38. Some judges refuse to hold hearings on these motions. JA38; *see, e.g.*, JA90. Others require "changed circumstances" to hear any motion raising issues with the Division's policies—even though no law imposes such a condition. JA38–39; *see, e.g.*, JA81, JA90. Others require the Pretrial Division to have issued an outright refusal to release the person—making it impossible to seek a judicial hearing during the long periods when the Division has not yet made a decision. *See, e.g.*, JA116–117; *see also, e.g.*, JA151 ("[I]t's not fair for [my client] for pretrial not to make a decision. If you say yes, great. If you say no, that allows me to at least file a habeas. But keeping him in limbo just keeps him in jail longer.").

Pretrial supervision agencies are common across Maryland. JA383. Yet only Prince George's County has a municipal agency that makes release decisions in the manner described above. *See, e.g.*, JA523–524 (describing practices in Montgomery County).

### C. Because of Defendants' outlier pretrial detention practices, hundreds of people who are judicially authorized for release remain in jail.

Defendants' policies and practices have upended the lives of thousands of people. At the time this lawsuit was filed, there were more than 900 people jailed at the

Prince George's County Jail. JA41. The Chief of the Pretrial Division estimated that judges had delegated to the County the release decision for approximately one-third of those, amounting to more than 300 people. JA41. The Division itself has identified hundreds of people who it was authorized to release prior to trial, but did not. *See* JA41; JA131.

A recent analysis of Prince George's County court hearings found that, between January and May 2022, 27 percent of bail hearings resulted in a delegated pretrial release decision. JA42. As of July 15, 2022, about half of those people who had been authorized for release had actually been released to pretrial supervision. Even those ultimately found to be "eligible" waited an average of 5.5 weeks (38 days) from authorization to release. JA42.[5] About 20 percent waited more than two months (60 days). JA42. Of those who remained detained, 44 percent had been detained for more than 60 days since a judge authorized their release. JA42.

Consider Plaintiff Anibal Hernandez. Until his arrest in June 2022, the 29-year-old Hernandez worked in construction and lived with his wife, 1-year-old daughter, parents, and other relatives. JA47. The intake fact sheet prepared by the Pretrial Division stated that he had no prior failures to appear and only a brief and dated criminal record. JA48. At Mr. Hernandez's initial bail review, a judge authorized the County to release Mr. Hernandez at any level of supervision. JA48. That day, Mr.

---

[5] This does not include persons released on home detention, as that information is not publicly available. JA42.

Hernandez's public defender emailed the Chief of the Pretrial Division seeking his release. JA48.

Mr. Hernandez remained in jail. Over the following weeks, his lawyer emailed the Division Chief five more times, requesting updates on the status of Mr. Hernandez's release or at least an explanation as to why he remained detained. JA48. There was no substantive response. JA48. When Mr. Hernandez's family called the Pretrial Division, they were told that the Division did not know why Mr. Hernandez had not been released. JA48.

Nearly three weeks after a judge authorized Mr. Hernandez's release, his attorney filed a motion for a show-cause order for contempt, requesting that the Director of the County Department of Corrections appear in court and explain. JA48. The following day, the Chief of the Pretrial Division replied to Mr. Hernandez's lawyer and stated that the Division had deemed Mr. Hernandez ineligible despite the court's order authorizing his release because he had "no verifiable address." JA166. This was inaccurate. The County did not explain how or why it came to that conclusion, what effort (if any) it had made to identify or verify an address for Mr. Hernandez, or whether it had contacted Mr. Hernandez's mother and girlfriend (whose contact information counsel had provided the day of authorization). JA48; JA166.

At a subsequent hearing, Mr. Hernandez's attorney detailed the Division's delays and implored the court to set money bail as an alternative to release under the Division's supervision. JA866–878. The judge set a money bail amount, Mr. Hernandez's family

paid it, and he was finally released—over a month after the judge first authorized his release. JA614. The State eventually dropped all charges against him.[6]

Other named Plaintiffs' experiences are representative of the County's opaque process, arbitrary delays, and uniquely extra-judicial decision-making:

- A judge authorized the Pretrial Division to release **Donnell Davis**. JA51. The Division refused to release him and he remained detained for 90 days. After almost three weeks, the Division filed a notice with the court stating that Mr. Davis was not eligible for pretrial release. JA52. The notice contained no explanation of why the Division had found Mr. Davis ineligible for release, or why the Division had taken three weeks to reach this determination. It simply suggested that anyone who wanted an explanation should call the Division. JA52. Nearly a month later, the Division filed a copy of the prior notice with the court—it did not even change the date—stating again that Mr. Davis was ineligible for pretrial release. JA52. Once again, the notice provided no explanation. Mr. Davis remained locked in his jail cell for 23 hours each day. JA52. Mr. Davis was not released until he went to trial, where he was found not guilty. JA53.

- A judge authorized the Pretrial Division to release **Leslie Sharp**. JA54. The judge reviewed Mr. Sharp's Intake Fact Sheet—which stated, *inter alia*, that Mr. Sharp was on supervised release in D.C. and had no prior failures to appear in court. JA53. The Division refused to release him because his D.C. probation agent had "requested a warrant" for his arrest, though they had no evidence a warrant had issued. JA54. He was detained for 29 days after the judge had ordered his release. JA55. He missed his best friend's funeral and was separated from his 12-year-old daughter. JA55. Mr. Sharp was released when, on the day of trial, the State dismissed all charges against him. JA55.

- A judge authorized the Pretrial Division to release **Robert Frazier**. JA46. The Division refused to release him because of an out-of-county detainer for a traffic violation and he was detained for nearly three months. JA47. While in jail, he learned that his mother had passed away, but he was unable to attend her service or pay his last respects to the woman who raised him. JA46. Mr. Frazier suffered

---

[6] *See* Notice of Nolle Prosequi and Dismissal, *State v. Anibal Erick Hernandez Jr.*, No. CT221365X (Prince George's County Circuit Court Apr. 13, 2023).

a seizure in jail—after which he never saw a doctor, and was moved to a cell with feces, bugs, and worms on the floor. JA46. Mr. Frazier was eventually released when the judge granted him a bond to address the traffic warrant on which the Division had based its refusal to release him, after which he was placed under the Division's supervision. JA598–599. The State later dropped all charges against him.[7]

## II. Procedural History

Plaintiffs brought this case on July 19, 2022, on behalf of themselves and a putative class of similarly situated persons. JA20. They sought declaratory relief, injunctive relief, and damages against Prince George's County and four county officials in their official capacities (collectively, "the County Defendants"), as the administrators of the pretrial release program and custodians of the county jail. JA58–60.[8] Plaintiffs also sought purely declaratory relief against the judges who delegate detention decisions to the County. JA59. Mr. Frazier, Mr. Hernandez, D.P., Mr. Butler, and Mr. Williams simultaneously moved on behalf of themselves and all others detained pursuant to the County's pretrial policies for preliminary injunctive relief against the County Defendants.

Defendants moved to dismiss. The district court dismissed Plaintiffs' claims against the four county officials, concluding that the official-capacity claims against

---

[7] *See* Notice of Nolle Prosequi and Dismissal, *State v. Robert Sylvester Frazier*, No. CT220860X (Prince George's County Circuit Court Jan. 10, 2023).

[8] These officials were Director of the County Department of Corrections, Corenne Labbé; Chief of the Pretrial Division, Jeffrey Logan; Chief of the Division's Community Supervision Section, Kenneth Gray; and Chief of the Division's Monitoring Services Unit, Tanya Law. JA59–60.

them were duplicative of the claims against the County, JA526, and held that certain of Plaintiffs' equitable-relief claims were moot, JA1198, JA1201. The court also held that the County possessed "quasi-judicial immunity" from damages, but that it was not entitled to quasi-judicial immunity from equitable relief. JA1198–1201. Likewise, the court held that Judge Defendants were not immune from Plaintiffs' claims for declaratory relief because judicial immunity does not "protect[] judges from suits for prospective equitable relief." JA1198. The court proceeded to find Plaintiffs' constitutional claims plausible. JA1201–1202. Accordingly, Plaintiffs' claims for prospective equitable relief against Defendant Prince George's County and the eleven Judge Defendants proceeded to discovery. *See* JA1358.

Plaintiffs then moved the court to reconsider its quasi-judicial-immunity holding based on settled Supreme Court precedent precluding a municipality from asserting absolute immunity. JA1291. The district court denied the motion, stating that the County was entitled to immunity because the Pretrial Division was acting as an "extension of a judicial function." JA1336. The court also denied Plaintiffs' request for a partial final judgment or to certify the issue for interlocutory appeal. JA1347, JA1352.

Shortly thereafter, the district court summarily denied Plaintiffs' preliminary-injunction motion in a one-paragraph order. JA1303. Plaintiffs appealed, and this Court vacated and remanded, finding that the district court abused its discretion by failing to make adequate factual findings or explain the reasons for its decision. *Frazier v. Prince*

*George's County*, 86 F.4th 537, 546 (4th Cir. 2023). This Court noted that there were "critical factual question[s]" that the district court must decide. *Id.*

On remand, the district court denied Plaintiffs' motion for preliminary injunction without briefing, but at the same time scheduled an evidentiary hearing to take place at which the court would "reconsider its determination." JA1392. The court specified that the evidence presented at the hearing should "includ[e] live testimony from the Defendant Judges, if possible[.]" JA1392. Accordingly, Plaintiffs subpoenaed two Judge Defendants for depositions in advance of that hearing. Judge Defendants moved to quash. JA1456.

Simultaneously, Defendants filed motions for judgment on the pleadings under Rule 12(c). JA1421. The County argued that "qualified [sic] judicial immunity" barred Plaintiffs' claims against them for equitable relief. JA1429. Judge Defendants argued that Plaintiffs' federal constitutional claims failed because a Maryland state rule authorized the local practices. JA1435, JA1452. The district court granted Defendants' motions on immunity grounds, quashed Plaintiffs' subpoenas, canceled the preliminary-injunction evidentiary hearing, dismissed Plaintiffs' remaining claims, and entered final judgment against Plaintiffs. JA1537. In granting judgment on the pleadings to Defendants, the district court accepted the same immunity defenses it had previously rejected with respect to declaratory and injunctive relief. JA1526–JA1532.

Plaintiffs timely appealed the district court's orders dismissing their claims and quashing their subpoenas. JA1539.

## SUMMARY OF ARGUMENT

The district court committed multiple legal errors in dismissing Plaintiffs' claims. First, the court subverted decades of Supreme Court precedent by granting quasi-judicial immunity—a personal immunity applicable only to individual officials sued in their personal capacities—to Prince George's County. Even if the County were not categorically ineligible for such immunity, the County's arbitrary, opaque, and unreasoned pretrial detention policies are not "quasi-judicial" under any conceivable reading of precedent such that absolute immunity would apply.

Second, the district court erred in dismissing Plaintiffs' claims for injunctive relief against the County. It is black-letter law that quasi-judicial immunity applies only to claims for damages, not to claims for equitable relief. And the County cannot claim statutory protection from injunctive relief under Section 1983 because it is not a judicial actor acting judicially, as the plain text of the statute requires.

Third, the district court erred in dismissing Plaintiffs' claims for declaratory relief against Judge Defendants and the County. Binding precedent instructs that common-law immunity does not apply to declaratory relief, and the text of Section 1983's statutory protection for judicial officials explicitly contemplates declaratory relief.

Fourth, the district court erred when it dismissed certain named Plaintiffs' claims for prospective equitable relief as moot after they were released from the jail, despite finding that their claims were "inherently transitory." Supreme Court precedent preserves such claims.

Fifth, the district court erred when it quashed Plaintiffs' subpoenas seeking deposition testimony from two Judge Defendants. The district court's speculation that Plaintiffs could not even ask the judges about general administrative policies regarding pretrial release misapplied settled privilege principles.

This Court should reverse the district court's errors, vacate the decisions below, and reinstate Plaintiffs' claims.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c). *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405–06 (4th Cir. 2002). The standard is the same for both motions. *Id.* The motion "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

This Court generally reviews a district court's order on a motion to quash a subpoena for abuse of discretion. *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 584 (4th Cir. 2007). When the district court's determination is based on a legal conclusion, however, this Court reviews that conclusion de novo. *Xactware Sols., Inc. v. Buildxact Software Ltd.*, 95 F.4th 810, 813 (4th Cir. 2024).

# ARGUMENT

## I.     Prince George's County is not quasi-judicially immune.

The district court concluded that quasi-judicial immunity barred Plaintiffs' claims against Prince George's County. JA1199–1201 (dismissing damages claims); JA1526–1532 (dismissing injunctive claims). That was reversible error. Quasi-judicial immunity is a personal immunity that is categorically unavailable to a municipality. And even if a municipality could be immune, the County does not act "quasi-judicially" when it applies its own policies in private to determine whether, when, and under what conditions people will be released before trial.

### A.  Quasi-judicial immunity is available only to individual officers sued in their personal capacities and is categorically unavailable to the County.

Judicial and quasi-judicial immunity are absolute *personal* immunities. They can be invoked only by individual officials sued in their personal capacities. Conversely, "municipal bodies sued under § 1983 cannot be entitled to an absolute immunity." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 701 (1978). Neither the district court nor the parties have found a single federal court case holding that a municipality can avail itself of an absolute immunity. This is unsurprising: Supreme Court precedent forecloses the expansion of quasi-judicial immunity to Prince George's County.

It is beyond dispute that a municipality cannot invoke any personal immunity from liability for its policies. *See id.* (no absolute immunity); *Owen v. City of Independence*, 445 U.S. 622, 637–38 (1980) (holding that, when a municipality is sued, "the

municipality may not assert [an official immunity] as a defense to [its own] liability under [section] 1983"); *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993) ("[M]unicipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983."). As this Court has neatly summarized: "[M]unicipalities have no immunity from damages liability flowing from their constitutional violations." *Berkley v. Common Council of City of Charleston*, 63 F.3d 295, 296 (4th Cir. 1995) (citing *Owen*, 445 U.S. at 657); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) ("[M]unicipalities, unlike public officials, cannot claim immunity from suit.").

This principle makes sense: the purpose of personal immunities, including judicial and quasi-judicial immunity, is to protect individuals' ability to exercise their discretion without "apprehension of personal consequences" like reprisal or financial ruin. *Stump v. Sparkman*, 435 U.S. 349, 355–56 (1978) (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)). The same concerns do not exist for suits against municipalities (or against municipal officers in their official capacities). *See Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). Official immunities (judicial, legislative, absolute, qualified, quasi, and so on) are "'personal defenses designed to protect the finances of public officials whose salaries do not compensate them for the risks of liability,' unlike local governments, 'which can tap the public fisc.'" *Capra v. Cook Cnty. Bd. of Rev.*, 733 F.3d 705, 711 (7th Cir. 2013) (quoting *Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006)). Indeed, if municipalities were afforded these various personal defenses, the concept of municipal liability would "be drained of meaning." *Monell*, 436 U.S. at 701.

Applying this long-established law, every federal court of appeals to address the question has held that a municipality—or a municipal official sued in their official capacity (the equivalent of a suit against the municipality)—categorically cannot assert quasi-judicial immunity. *See, e.g.*, *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 483–86 (5th Cir. 2000); *Alkire v. Irving*, 330 F.3d 802, 810–11 (6th Cir. 2003); *Capra*, 733 F.3d at 711–12; *Garcia v. County of Riverside*, 817 F.3d 635, 639 (9th Cir. 2016); *Kimberly Regenesis, LLC v. Lee County*, 64 F.4th 1253, 1259–60 (11th Cir. 2023). The underlying facts are of no import: if the defendant is a municipality, absolute immunity cannot apply.

The district court gave little explanation for deviating from this binding principle. It cited no controlling precedent for its legally incorrect assertion that "[t]here has never been a rule that only individuals, and not entities, can come within the protection of quasi-judicial immunity." JA1338. Nor did it identify a single instance of a court applying quasi-judicial immunity (or any other personal immunity) to a municipality or municipal entity. The only legal supports it cited are two district court cases applying immunity to state entities. *See Gilmore v. Bostic*, 636 F. Supp. 2d 496, 506 (S.D. W. Va. 2009) (state parole board); *Goluszek v. H.P. Smith Paper Co.*, No. 93 C 5329, 1993 WL 358160, at *2 (N.D. Ill. Sept. 14, 1993) (state supreme court committee). Neither case, both of which seemed to confuse sovereign and quasi-judicial immunity, held that quasi-judicial immunity applies to a municipality. To the contrary, the Seventh Circuit later distinguished *Goluszek* while confirming that a county entity cannot receive quasi-

judicial immunity. *See Capra*, 733 F.3d at 711. These cases do not support the unprecedented conclusion that a county can be quasi-judicially immune from suit.

The district court's dismissal of Plaintiffs' claims against the County should be reversed.

**B. Even if quasi-judicial immunity were available to municipalities, quasi-judicial immunity does not apply to the County's unconstitutional policies and practices in this case.**

Even if absolute immunity could apply to a county, the district court erred in concluding that the County was quasi-judicially immune for its conduct here. That conclusion failed to credit the allegations in Plaintiffs' complaint, flouting the standard of review for a Rule 12 motion. *See Edwards*, 178 F.3d at 244. The pleadings allege that when the County designs and administers its own internal policies for the timing and outcome of pretrial release and detention decisions without judicial oversight, it does not operate as a mere arm of the court, nor does it apply procedural safeguards or any of the other trappings of "judicial" action. Quasi-judicial immunity is thus unavailable.

### i. *The County's conduct is not explicitly directed by a judge.*

One form of quasi-judicial immunity protects a "judge's subordinates" carrying out "functions that are more administrative in character . . . undertaken pursuant to the judge's explicit direction." *In re Mills*, 287 F. App'x 273, 279 (4th Cir. 2008) (quoting *Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir. 1992)). This immunity derives from the common-law rule that judges are immune from claims for money damages when performing judicial acts within their jurisdiction. *See Mireles v. Waco*, 502 U.S. 9, 9–10

(1991). The idea is that those who act under the "explicit direction" of the court are, functionally speaking, "an arm of the judicial officer who is immune." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). Nevertheless, the Supreme Court has "been quite sparing in [its] recognition of absolute immunity" because of the power it confers and has "refused to extend it any further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 487 (1991) (internal quotation marks omitted); *see also Antoine v. Byers & Anderson*, 508 U.S. 429 (1993) (declining to extend absolute immunity to certain functions of court reporting).

The district court applied this form of derivative quasi-judicial immunity to the County. *See* JA1336–1337 (stating without support that the County is "acting 'in obedience to' and under the 'direction' of the judges" and that "its involvement in the pre-trial release process constitutes nothing less than the extension of a judicial function"). The court declared that, "from all appearances, the Pretrial Division resembles the many court employees who have previously been afforded judicial immunity for carrying out a judge's order." JA1531 (quoting JA1337–1338).

That was error. The district court appeared to hinge its immunity holding on a single question: "whether the Judge Defendants in any significant way relinquished ultimate control over the decision to release or detain a defendant when they make a referral to the Pretrial Division." JA1511. But the legal test for quasi-judicial immunity does not ask whether a judge has "relinquished ultimate control." It asks whether the judges explicitly direct the County's conduct such that the County exercises no

independent discretion in creating and implementing its own policies. *See In re Mills*, 287 F. App'x at 279–80 (declining to apply quasi-judicial immunity where the judge's arrest warrant had not authorized the officers' alleged constitutional violations).

The district court cited no support in the pleadings for its conclusion that Prince George's County or its Pretrial Division are administrative subordinates who exercise no discretion while carrying out judicial orders. On a Rule 12 motion, Plaintiffs' pleadings control. *See Edwards*, 178 F.3d at 244. And the pleadings, construed in Plaintiffs' favor, explain that Judge Defendants do not explicitly specify, direct, or control the County's policies. Quite the contrary. Among other things, Plaintiffs allege that: (1) County officials, not the Judges, designed the County's pretrial release policies and can modify them at their discretion, *see* JA32; (2) County officials devised the eligibility criteria "without judicial input or oversight," JA32; (3) County officials apply those criteria to individual cases outside the presence or control of the Judges and without any judicial process whatsoever, *see* JA34–35; and (4) the Judges do not require County officials to complete their arbitrary release decisions within any timeframe, *see* JA33–34. The County has further demonstrated its control over these policies by, for example, modifying the amount of time it gives its employees to make Level 4 release determinations. *Compare* JA123–124, *with* JA1317. On these facts, the County cannot possibly be seen as an arm of the court.

While Plaintiffs' allegations control, Defendants' own statements confirm that the County does not make decisions under the direction of the Judges. The County

emphasized that "although the court can refer people to [the program] . . . they cannot force us to release somebody in our program. It is our program." JA1409. The County repeatedly asserted that it—not the Judges—controls the Pretrial Division's policies and applications. *See* JA1410 ("But the Court can't force [the Pretrial Division] to accept somebody into our program. We still can evaluate them and say, No, we don't want to accept them in the pretrial release program."); JA1427 ("In the event that PGCDOC determines that the detainee is not eligible, it indicates its . . . unwillingness to accept the detainee into the program[.]"). Judge Defendants, in turn, confirmed their lack of control over the Division's policies, stating that "the decision whether [the County] DOC will accept someone [into the pretrial release program] *is solely within DOC's discretion.*" JA1454 (emphasis added).[9]

---

[9] A second form of quasi-judicial immunity protects officials who oversee formal adjudications with adequate procedural safeguards that are "functionally comparable" to judicial proceedings. *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985) (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)). The County did not seek this form of quasi-judicial immunity, with good reason. The Division's pretrial detention policies and subsequent decisions lack *any* procedural safeguards akin to a judicial proceeding. The policies themselves are not judicial, and the application of those policies is not adversarial in any way. The decision-making process takes place in private, without a neutral and detached factfinder, a hearing, notice or an opportunity to be heard, application of evidentiary rules, opportunity to present evidence, recourse for countering inaccurate information, creation of a transcript, or written or oral findings. JA34–35. Class members endure weeks or months of pretrial jailing while waiting for the County's decision. JA33–34, 38–39. The County's policies "have no identification with the judicial process of the kind and depth that has occasioned absolute immunity." *Cleavinger*, 474 U.S. at 204.

### ii. *Plaintiffs' claims against the County are for non-judicial conduct.*

The district court ignored the County's actual policies. Instead, the court reasoned that if Judge Defendants were acting judicially when initially authorizing release, the County was acting judicially as well in later delaying or denying it. JA1528. It had the erroneous impression that Plaintiffs sought to hold the County accountable not for its own policies, but for "the violations that the judges, were it not for the shield of judicial immunity, might be held to account for." JA1338–1339. This misreads the complaint. To be sure, Plaintiffs raise a claim for declaratory relief against Judge Defendants for violating the constitutional requirements for valid orders of pretrial detention. JA68. But Plaintiffs state a distinct claim against the County for its own policies in cases in which the judges have authorized release. Plaintiffs allege that the County harms them through its policies governing *its own internal* policies and practices following a pretrial release authorization, which cause Plaintiffs to remain unlawfully detained without constitutionally adequate process. JA58–60.

A few examples illustrate this distinction: Neither Judge Defendants nor the State force the County to deny people release because they live in an adjoining county or are unhoused. JA37. Or to promulgate and enforce policies that deny people release for reasons already considered by the judge who authorized release, such as a blanket refusal for people with certain criminal histories or charges. JA35–36. Nor do they require the County to act in secret or prevent it from incorporating longstanding

procedural safeguards like notice and opportunity to be heard into its detention determinations. JA34–35. As the County demonstrated when it tweaked its policy regarding the timeframe for Level 4 release determinations, it has discretion to change or abandon its unconstitutional practices. *Compare* JA123–124, *with* JA1317. Instead, it chooses to continue them. The fact that Plaintiffs *also* have claims against Judge Defendants for declaratory relief for independent legal violations occurring at a different stage of the pretrial process does not mean Plaintiffs cannot bring distinct claims against the County.

In any event, there is no basis for the district court's conclusion that the County acts judicially when it devises and applies policies to people who have already been judicially authorized for release. The court rested that conclusion primarily on *Gibson v. Goldston*, 85 F.4th 218, 223–26 (4th Cir. 2023). But *Gibson* offers no support. In *Gibson*, this Court considered whether common-law judicial immunity applied to a family court judge who took part in a search of a litigant's home as part of property-division proceedings in a divorce. The Court found that these actions "had none of the usual trappings of a judicial proceeding" and were thus non-judicial. *Id.* at 224. Accordingly, the Court held that it was improper to "swathe [the judge's] actions in judicial immunity's embrace." *Id.* The plaintiffs' claims were allowed to proceed. *Id.* at 226. The case did not even involve a non-judge actor seeking immunity, much less a county. *Gibson* is a straightforward application of existing common-law principles—when

judges act non-judicially, judicial immunity is unavailable—and provides no support for the district court's reasoning.

The district court's failure to analyze the County's policies contributed to its error in finding that those policies and their application were judicial actions entitled to absolute immunity. Although the County's policies determine whether a person remains jailed, the similarities with a judicial proceeding end there.[10]

## II. The County is not immune from injunctive relief.

The district court also erred in dismissing Plaintiffs' claims for injunctive relief against the County. JA1526–1532. The district court confused and conflated common-law quasi-judicial immunity with the statutory protections for judges added to Section 1983, but the differences are crucial—and neither applies to the County.

It is well established that "absolute" common-law immunities bar only damages, not prospective relief. *See, e.g.*, *Sup. Ct. of Va. v. Consumers Union, Inc.*, 446 U.S. 719, 735 (1980) ("[W]e have never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts."). In *Pulliam v. Allen*, which concerned a request for injunctive relief against orders of detention issued by a

_____

[10] The County is also not entitled to immunity for its pretrial detention proceedings because it is acting in the "clear absence of all jurisdiction." *Stump*, 435 U.S. at 357 (quoting *Bradley*, 80 U.S. at 351). Defendants who are "without authority" to carry out judicial functions, even where they "believe[] that [their] actions [are] sanctioned by court order," are not entitled to quasi-judicial immunity. *Gross v. Rell*, 695 F.3d 211, 217 (2d Cir. 2012). State law requires pretrial detention determinations to be made by a judge in court. *See* Md. Rule 4-216.1; *see also Frazier*, 86 F.4th at 541–42.

judge, the Supreme Court held that common-law judicial immunity does not bar "prospective injunctive relief against a judicial officer acting in her judicial capacity." 466 U.S. 522, 541–42 (1984).

Twelve years after *Pulliam*, Congress enacted the Federal Courts Improvement Act of 1996 (FCIA), Pub. L. No. 104-317, § 309(c), 110 Stat. 3847, 3853, to amend Section 1983 to provide a form of statutory protection from injunctive relief for judges acting in their judicial capacity. The statute restricts the availability of injunctive relief "against a judicial officer for an act or omission taken in such officer's judicial capacity," making such relief available, but only after a declaratory decree has been violated or is unavailable. 42 U.S.C. § 1983. Tracking *Pulliam*'s language about judicial immunity closely, the FCIA thus created a limited statutory exception to *Pulliam*'s holding that specifically shields *judicial officers* from injunctions unless the judge is first given a chance to comply with less intrusive declaratory relief or if a declaration is unavailable to address the constitutional violation. By its plain language, the FCIA did not extend the same immunity to the broad range of quasi-judicial actors entitled under the common law to *damages* immunity or to any other person not acting in a "judicial capacity." Thus, in appropriate circumstances, quasi-judicial actors continue to enjoy *common-law* immunity from damages, but not Section 1983's *statutory* protection from initial injunctive relief.

Contrary to the district court's suggestion, JA1528–1529, the 1996 amendment to Section 1983 did not disturb the longstanding principle that common-law absolute

immunities do not bar prospective relief, aside from providing limited protection for "judicial officers" acting in a "judicial capacity."[11] *See, e.g., Foster v. Fisher*, 694 F. App'x 887, 889 (4th Cir. 2017) ("[J]udicial immunity does not apply to claims for equitable relief."); *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003) ("Absolute judicial immunity, however, does not bar prospective relief against a judicial officer."); *Just. Network Inc. v. Craighead County*, 931 F.3d 753, 763 (8th Cir. 2019) (same); *Moore v. Urquhart*, 899 F.3d 1094, 1104 (9th Cir. 2018) (same). Even the County acknowledged the inapplicability of quasi-judicial immunity to prospective relief, asserting it as an affirmative defense only to Plaintiffs' claims for money damages. JA1379.

Initially, the district court recognized this well-established principle. It correctly acknowledged that judicial and quasi-judicial immunities do not bar claims for prospective relief. JA1198–1201. A year later, however, the court changed course. Relying entirely on this Court's intervening opinion in *Gibson*, 85 F.4th 218, it misinterpreted the panel's introductory language describing judicial immunity as "absolute" and a "complete bar to suit." JA1527–1528. Based on this language, the

---

[11] The cases the district court relied on do not support its holding. One applied absolute judicial immunity to *Bivens* claims against federal judges, noting that unique concerns distinguish *Pulliam* as applied to suits against federal judges. *See Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000). Another is a bread-and-butter application of the FCIA to a suit against state court judges. *See Nollet v. Justs. of the Trial Ct.*, 83 F. Supp. 2d 204, 210 (D. Mass. 2000) (immunizing judges against injunctive claims but not claims for declaratory relief). The only one that involved a non-judge official concerned claims against a court clerk administrator *in their personal capacity. See Cain v. City of New Orleans*, 184 F. Supp. 3d 379, 391 (E.D. La. 2016). These cases have no relevance to Plaintiffs' claim for injunctive relief against the County.

district court concluded that quasi-judicial immunity barred Plaintiffs' claims for injunctive relief:

> [T]he Judge Defendants in this case would certainly appear to enjoy absolute immunity, not only against any claim for money damages, but against any suit at all. *See Gibson*, 85 F.4th at 222. Given that quasi-judicial immunity, a "derivative of judicial immunity," is likewise "absolute," . . . the County would also appear to be immune from suit.

JA1528.

The district court misconstrued the meaning of "absolute" in the context of common-law immunities. Judicial immunity and quasi-judicial immunity are "absolute" in contrast to other immunities that are "qualified." *See Butz*, 438 U.S. at 484 (contrasting "absolute immunity from suit" with "qualified immunity based on good faith and reasonable grounds"). "Absolute" immunities are so-named because they apply even when an official fails to act in good faith or violates clearly established rights. But, as noted, such absolute immunities are "only absolute" with respect to damages, not prospective relief. *Livingston v. Guice*, 68 F.3d 460 (4th Cir. 1995). *Gibson* did not address these questions, let alone upend decades of Supreme Court precedent. Instead, it simply denied judicial immunity to a family court judge who was not acting judicially. It did not suggest that judges have immunity from *all* forms of prospective relief, much less that a non-judicial actor like the County does.

Accordingly, the statutory protections embedded in the FCIA may apply to Judge Defendants, but not to the County. The amended text of Section 1983 applies only to "a judicial officer," and only for acts or omissions taken in the officer's "judicial

capacity." While a clerk or a magistrate may act as a "judicial officer," to apply the term to a municipal entity would stretch it beyond recognition. *See Moore*, 899 F.3d at 1104 ("As Congress was undoubtedly aware, use of the term 'judicial' implicates the familiar three-branch structure of government."); *id.* at 1105 ("If Congress wanted the Act to cover not just judges and their equivalents but also law enforcement officials like the Sheriff, we think Congress would have spoken in far clearer terms."). The County did not make that argument, and Plaintiffs are unaware of any precedent in the nearly 30 years since FCIA was enacted that applies Section 1983's statutory immunity to a municipality. Moreover, even if a municipal entity could somehow be considered a judicial officer, the County is not acting judicially and has not argued otherwise. *See supra* note 9 (citing *Cleavinger*, 474 U.S. at 200, 204); *see also Sup. Ct. of Va.*, 446 U.S. at 731 (state supreme court's issuance of state bar code was act of rulemaking, not adjudication, and thus non-judicial). Even if the County were somehow deemed a quasi-judicial actor, therefore, immunity would not bar Plaintiffs' claims for prospective relief.

## III. Defendants are not immune from declaratory relief.

The district court further erred in holding that both Judge Defendants and the County are immune from declaratory relief. JA1532. Under longstanding precedent, judicial immunity does not bar a forward-looking declaratory judgment. And the FCIA had no effect on the availability of declaratory relief against judges—in fact, its language explicitly contemplates that a declaratory judgment may be granted against judicial officers. *See* 42 U.S.C. § 1983.

33

The district court's reasoning on this point is difficult to parse. It correctly noted that it had authority to enter a declaratory judgment, JA1532, but then it veered off course. Rather than addressing Plaintiffs' claim for declaratory relief on the merits, the district court concluded that Defendants were immune even from a declaratory decree. Without citing any authority, the district court wrote that, "for all the reasons stated in connection with the [district court's] judicial and quasi-judicial immunity analysis, there is no discernible basis on which a declaratory decree against Defendants could be fashioned." JA1532. According to the district court, "[t]he inevitable determination would still be that Judge Defendants and, by extension, the County Defendant still enjoy judicial and quasi-judicial immunity with respect to their pretrial release decisionmaking," and thus "there would be no declaratory relief to be had." JA1532.

For at least a half-century it has been the law of this circuit that common-law judicial and quasi-judicial immunity do not apply to claims for equitable relief. *See Timmerman v. Brown*, 528 F.2d 811, 814 (4th Cir. 1975) ("[J]udicial and quasi-judicial immunity . . . protect[] qualified defendants only from claims for money damages."); *Fowler v. Alexander*, 478 F.2d 694, 696 (4th Cir. 1973). Such immunity "does not extend to [an] action for injunctive and declaratory relief." *Timmerman*, 528 F.2d at 814 (quoting *Fowler*, 478 F.2d at 696). The Supreme Court reached the same conclusion in *Pulliam*, a case originating in the Fourth Circuit. 466 U.S. at 541–42 ("[T]he common-law doctrine of judicial immunity . . . is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity."). This Court has recognized the continuing

validity of that holding with respect to declaratory relief. *Foster*, 694 F. App'x at 889 (citing *Timmerman* for the proposition that "judicial immunity does not apply to claims for equitable relief").

When Congress amended Section 1983 in 1996 to partially abrogate the Supreme Court's decision in *Pulliam* with respect to judicial immunity from injunctions in the first instance (*supra*, at 29–30), the amendment had no effect on the availability of declaratory relief. *See* FCIA § 309(c), 110 Stat. at 3853. As amended, Section 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted *unless a declaratory decree was violated or declaratory relief was unavailable*." 42 U.S.C. § 1983 (emphasis added). As the statute's plain language makes clear, the 1996 amendment did not alter *Pulliam*'s recognition that judicial immunity is inapplicable to claims for declaratory relief. Indeed, by contemplating that judicial officers may violate declaratory decrees entered against them, the amended text itself "now implicitly recognizes that declaratory relief is available against judicial officers." *Ward v. City of Norwalk*, 640 F. App'x 462, 467 (6th Cir. 2016). Applying this text, federal courts regularly issue such relief against judges. *See Cain v. City of New Orleans*, 281 F. Supp. 3d 624, 646 (E.D. La. 2017), *aff'd sub nom. Cain v. White*, 937 F.3d 446 (5th Cir. 2019); *Caliste v. Cantrell*, 329 F. Supp. 3d 296, 314 (E.D. La. 2018), *aff'd*, 937 F.3d 525 (5th Cir. 2019).

The district court read the FCIA backward. Rather than making the availability of injunctive relief depend on the availability of declaratory relief, as the statute does,

the district court seemed to say that because the 1996 amendment precludes entry of injunctive relief in the first instance, declaratory relief is also unavailable. *See* JA1532. But on that circular reading of Section 1983, judges would always be immune from both declaratory and injunctive relief. That would render the language meaningless. Contrary to the district court's reasoning, if declaratory relief were actually unavailable against judicial officials, then by the explicit language of the statute, judges would consequently not be immune from injunctive relief, because the statute permits a court to enter an injunction against judges when "declaratory relief [is] unavailable." 42 U.S.C. § 1983. By turning the text of Section 1983 on its head, the district court committed reversible error.

In a single sentence, the district court also suggested that "serious questions of federal-state relations would arise if a federal court were to take over the restructuring and subsequent monitoring of how state Judges and their affiliates engage in pretrial release decisionmaking." JA1532. It cited no authority in support. Under the Declaratory Judgment Act, a district court must assess whether a declaration "will serve a useful purpose in clarifying and settling the legal relations in issue" and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). And in cases alleging constitutional harms, the existence of an ongoing violation will support declaratory relief. *Cf. Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th

Cir. 2013) ("[U]pholding constitutional rights surely serves the public interest." (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). The district court's passing reference to "federal-state relations" failed entirely to engage with these standards.

In any event, a declaratory judgment in this case would not trench on federal-state relations, as the district court itself found when rejecting Defendants' request to abstain under *Younger v. Harris*, 401 U.S. 37 (1971). JA1195–1196. Courts have a "virtually unflagging" obligation to decide controversies in their jurisdiction. *Sprint Comm'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). As the district court explained at that time, "this lawsuit will not interfere with the determination of guilt or innocence at the trials of Plaintiffs because the issue of pretrial release is entirely collateral to the question of an individual's criminal guilt or innocence." JA1196. And "Plaintiff[s'] criminal trials are not an adequate forum for *Younger* purposes because Plaintiffs cannot raise issues of pretrial release as part of their criminal defense." JA1196. Federalism thus provides no basis for denying a declaratory judgment in this case.

This Court should reverse the dismissal of Plaintiffs' declaratory claims and remand for consideration of those claims on the merits.

## IV. The transitory nature of the putative injunctive class protects the named Plaintiffs' class-wide equitable claims from becoming moot.

The district court further erred in dismissing several named Plaintiffs who were released from pretrial detention after the litigation commenced. A longstanding mootness exception applies in class actions to claims like Plaintiffs' that are "inherently transitory" or "capable of repetition, yet evading review."

The district court briefly stated that the forward-looking equitable claims of Plaintiffs who were detained when the complaint was filed but released before the district court decided the motions to dismiss were moot, because future "changes to the pretrial process" would not affect them. JA1198, JA1201. Having elsewhere dismissed Plaintiffs' damages claims, the district court therefore dismissed these "Released Plaintiffs" entirely. JA1205.

Supreme Court precedent makes clear this was wrong. *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980); *Gerstein v. Pugh*, 420 U.S. 103 (1975); *Sosna v. Iowa*, 419 U.S. 393 (1975). In *Gerstein*, for instance, the Supreme Court considered a putative class action in which two plaintiffs challenged pretrial detention without a timely judicial hearing on probable cause. 420 U.S. at 105–06. Although the two named plaintiffs were convicted after bringing suit— and thus injunctive relief regarding pretrial detention could no longer affect them—the Supreme Court explained that the case fell in a "narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed

members of the class." *Id.* at 110 n.11. Because "[p]retrial detention is by nature temporary[] and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted," the claim was "capable of repetition, yet evading review." *Id.*[12]

In *Geraghty*, the Supreme Court further explained that a "relation back" approach applies to transitory class-action claims like this one. 445 U.S. at 398. Under those circumstances, so long as the named plaintiff has the requisite "personal stake at the outset of the lawsuit," he could "litigate the class certification issue despite" subsequent loss of a personal stake. *Id.* This was true both where the claim was "capable of repetition, yet evading review" as to the named plaintiff himself, and for "inherently transitory" claims (like ones "challenging pretrial detention conditions"). *Id.* at 398–99; *see also McLaughlin*, 500 U.S. at 52 (applying the "inherently transitory" exception where "the class was not certified until after the named plaintiffs' claims had become moot").

The same analysis applies here. The district court itself held elsewhere in its motion to dismiss opinion that "[p]retrial detention is a classic example of an inherently transitory claim," such that Plaintiffs could "fairly invoke the 'inherently transitory' exception." JA1204 (citing *Sosna*, 419 U.S. at 402 n.11; *McLaughlin*, 500 U.S. at 52; and *Gerstein*, 420 U.S. at 110 n.11). And as this Court explained in its prior opinion in this

---

[12] It is not necessary for the class to have been certified before the named plaintiffs were released to avoid mootness, so long as there is "the constant existence of a class of persons suffering the deprivation" "with a continuing live interest in the case." *Id.*

case, "[a] pretrial detainee who is a putative class representative retains the standing he enjoyed when he sought class certification *even if he is released* or tried before the class is certified." *Frazier*, 86 F.4th at 543 (citing *Gerstein*, 420 U.S. at 110 n.11) (emphasis added); *see also Jonathan R. ex rel. Dixon v. Justice*, 41 F.4th 316, 325–26 (4th Cir.), *cert. denied*, 143 S. Ct. 310 (2022). This is equally true of the named Plaintiffs who were detained when the complaint and class certification motion were filed, but subsequently released before the district court resolved the motions to dismiss. This Court should reinstate the improperly dismissed plaintiffs as class representatives.

## V.     Plaintiffs are entitled to relevant non-privileged testimony from Judge Defendants.

Finally, the district court erred in granting Judge Defendants' motion to quash Plaintiffs' subpoenas seeking deposition and hearing testimony from two Judge Defendants. After the district court set an evidentiary hearing and signaled that testimony from the judges would be important to its decision, Plaintiffs sought to question the judges about, among other things, their observations as witnesses of how the County's pretrial policies and practices function, any training they may have received on the pretrial process or the County's policies, and their general policies regarding pretrial release and detention. *See, e.g.*, JA1494–1495 (interrogatories inquiring into those and similar topics). Judge Defendants opposed this testimony, and the district court ultimately adopted Judge Defendants' flawed contention that *any* questioning—even

unrelated to the adjudication of individual cases—necessarily implicated privileged judicial decision-making. JA1512–1522. This constituted an abuse of discretion.

It is a "fundamental maxim that the public . . . has a right to every man's evidence," *United States v. Bryan*, 339 U.S. 323, 331 (1950), and "exceptions to the demand for" evidence "are not lightly created nor expansively construed, for they are in derogation of the search for truth," *United States v. Nixon*, 418 U.S. 683, 710 (1974). Accordingly, "[i]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *see also Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 125 (D. Md. 2009) (noting that a motion to "prevent the taking of a deposition is regarded unfavorably"). As a result, "most requests of this kind are denied." 8A Fed. Prac. & Proc. Civ. § 2037 (3d ed.) (June 2024 update) (collecting cases). While "[t]he general rule is that a judge may not be compelled to testify concerning the mental processes used in formulating official judgments or the reasons that motivated him in the performance of his official duties," *Ciarlone v. City of Reading*, 263 F.R.D. 198, 202 (E.D. Pa. 2009), this "judicial deliberative process privilege" is "strictly construed," *Cain v. City of New Orleans*, No. 15-CV-4479, 2016 WL 7156071, at *5 (E.D. La. Dec. 8, 2016).

This Court has not weighed in on the judicial deliberative process privilege, but the "leading case in the federal courts" on the issue, *id.*, is *In re Certain Complaints*, 783 F.2d 1488 (11th Cir. 1986). In that case, a committee of the Eleventh Circuit's Judicial

Council subpoenaed the staff members of a federal judge while investigating judicial misconduct allegations. *Id.* at 1491. The staff members generally refused to comply with the subpoenas, citing the judicial deliberative process privilege. *Id.* at 1492–93. The circuit court noted the "probable existence" of a "judicial privilege protecting the confidentiality of judicial communications," necessary to "protect judges' independent reasoning from improper outside influences" and to "safeguard[] legitimate privacy interests of both judges and litigants." *Id.* at 1518, 1520. At the same time, the court recognized that the party asserting "judicial privilege" bore the burden of "demonstrating that the matters under inquiry f[ell] within the confines of the privilege" and held that the privilege extends only to "official judicial business such as, for example, the framing and researching of opinions, orders, and rulings." *Id.* at 1520.

Following these principles, the court ordered that the subpoenas be enforced in full. While recognizing that the privilege applied to "questions probing the core of the confidentiality interest at stake: communications . . . concerning matters pending before" the judge, *id.* at 1521, the court nevertheless ordered staff members to testify about those matters. *Id.* at 1521–24. It held that the privilege was "qualified, not absolute," and had been overcome by the importance of the investigation and the information sought. *Id.*

Courts throughout the country have elaborated on this guidance. The privilege "primarily protects judicial decision-making in the context of adjudicating particular cases." *Cain*, 2016 WL 7156071, at *4–6 (collecting cases); *see also In re Enf't of Subpoena*,

972 N.E.2d 1022, 1033 (Mass. 2012) (explaining that the privilege "covers a judge's mental impressions and thought processes in reaching a judicial decision," as well as "confidential communications among judges and between judges and court staff made in the course of and related to their deliberative processes in particular cases"). The privilege "generally does not extend to deliberations regarding administrative or executive acts performed by judges" or to "'matters of fact' that 'do not probe into the mental processes employed in formulating the judgment in question.'" *Feltz v. Bd. of Cnty. Comm'rs of Cnty. of Tulsa*, No. 18-CV-298, 2020 WL 2039250, at *9 (N.D. Okla. Apr. 28, 2020) (quoting *United States v. Roebuck*, 271 F. Supp. 2d 712, 719 (D.V.I. 2003)). It similarly does not extend to general policies or practices, such as a judicial officer's "understanding of their powers and responsibilities pursuant to all applicable laws, and how they interpret those powers and responsibilities in carrying out their duties." *United States v. Lake Cnty. Bd. of Comm'rs*, 233 F.R.D. 523, 528 (N.D. Ind. 2005) (internal quotation marks omitted).

While purporting to apply these standards, the district court erred repeatedly. As a threshold matter, the court misinterpreted the privilege to categorically protect Judge Defendants from testifying instead of adjudicating the fact-specific privilege question when raised in response to specific deposition questions. "It is well settled that a witness whose testimony is subpoenaed cannot simply refuse to appear altogether on grounds of privilege, but rather must appear, testify, and invoke the privilege in response to particular questions." *In re Certain Complaints*, 783 F.2d at 1518. Without those

"particular questions" to guide the inquiry, "a court would be forced to attempt to determine the existence, application, and scope of an asserted privilege in ignorance of the context in which it is alleged to apply." *Id.* The district court thus should have denied Judge Defendants' motion to quash as "not yet ripe for decision," *id.*, requiring them to sit for their depositions and assert the privilege on a question-by-question basis as a "fact-specific" privilege requires, *see Al Otro Lado, Inc. v. Wolf*, No. 17-CV-2366, 2020 WL 4336064, at *4 (S.D. Cal. July 27, 2020); *see also, e.g.*, *Kava Holdings, LLC v. Rubin*, No. 16-CV-6955, 2016 WL 6652706, at *1 (C.D. Cal. Nov. 10, 2016) (declining to consider a deliberative process privilege argument in advance, concluding that it was "highly unlikely that *all* testimony . . . on this topic would be privileged"). Its failure to do so was reversible error.

In granting a blanket privilege, the district court failed to hold Judge Defendants to their "burden of establishing that [the] privilege" applied. *In re Grand Jury Proceedings*, 33 F.3d 342, 352 (4th Cir. 1994). Instead, the court abused its discretion by speculating that the only questions Plaintiffs might conceivably ask in a hypothetical deposition would necessarily be privileged. The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The Federal Rules of Evidence, in turn, explain that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R.

Evid. 401. Given this "broad scope of discovery," *Ralston Purina Co. v. McFarland*, 550 F.2d 967, 973 (4th Cir. 1977), "the deposition-discovery rules are to be accorded a broad and liberal treatment," and "either party may compel the other to disgorge whatever facts he has in his possession," *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

In light of the broad scope of permissible discovery, there was no legitimate basis for the district court's conclusion that "*any* testimony from the Subpoenaed Judges would inevitably probe directly into their deliberative processes in the performance of their official duties." JA1520 (emphasis added). According to the district court, the "jugular inquiry" in Plaintiffs' hypothetical questions "would inevitably be whether Judge Defendants *believe* they relinquish control over their decisions to release or detain criminal defendants when they refer those defendants to the County's Pretrial Division." JA1516. The district court reached this conclusion based on "its view" that "the controlling question that may well resolve the entirety of the case is the narrow question of judicial and quasi-judicial immunity." JA1515 (internal quotation marks omitted). Plaintiffs have explained why this view of immunity was erroneous (*supra* Parts I–III), and the district court showed an entirely inaccurate understanding of Plaintiffs' theory on the merits of this case. But in any event, basic tenets of evidence provide that parties may ask deposition questions beyond specific ones that the court believes are controlling.

To that point, throughout discovery Plaintiffs had repeatedly clarified that they did not seek to ask Judge Defendants about their deliberative processes in specific cases.

*See, e.g.*, JA1495 (interrogatories expressly excluding information "related to any individual case or determinations"). Instead, they plan to ask the judges about their "general policies regarding pretrial release, their understanding of their own authority with regard to pretrial release, and any training they may have received with respect to the same." JA1469 (internal quotation marks omitted). Such "broad inquiries" about judges' "understanding of their powers and responsibilities pursuant to all applicable laws, and how they interpret those powers and responsibilities" fall outside the privilege. JA1468–1469 (citing cases) (internal quotation marks omitted). The district court overlooked Plaintiffs' unequivocal assertions about the scope of desired testimony.

The district court also committed reversible error by overstating the scope of the privilege as extending beyond individual adjudications. It concluded that Plaintiffs' questioning would "necessarily plumb the Subpoenaed Judges' decisionmaking with respect to their official duties, in flat contradiction of the proposition that Judges 'cannot be subjected' to the scrutiny of oral testimony." JA1516 (quoting *United States v. Morgan*, 313 U.S. 409, 422 (1941)). To Plaintiffs' knowledge, no court has ever suggested that the judicial deliberative process privilege extends to all topics connected to a judge's official duties; as discussed (*supra*, at 41–43), it covers only the mental processes associated with decision-making in individual cases. *Morgan* did not contradict this, explaining only that the agency official in that case should not have been subjected to examination regarding his mental processes during an adjudicative proceeding. 313 U.S. at 422.

The district court's conclusion—without citation—that "collective policy" regarding pretrial release authorizations falls within the scope of the privilege was similarly erroneous. *See* JA1516. Courts evaluating the applicability of the privilege have found that questions aimed at understanding "factual procedures that were observable during public proceedings" and "what policies or authority [judges] generally follow" are not protected. *See Feltz*, 2020 WL 2039250, at *11; *see also Lake Cnty. Bd. of Comm'rs*, 233 F.R.D. at 528 (declining to apply the privilege to judges' "understanding of their powers and responsibilities pursuant to all applicable laws, and how they interpret those powers and responsibilities in carrying out their duties"). Judge Defendants' testimony concerning the generalized procedures involved in the pretrial release authorization process is highly relevant to the allegations in the complaint and is not privileged.[13]

This Court should reverse the district court's erroneous decision granting Judge Defendants' motion to quash.

## CONCLUSION

The district court erred by dismissing Plaintiffs' claims and quashing their subpoenas. This Court should vacate and remand for further proceedings.

---

[13] Even if the privilege could apply to a judge's general understandings and policies, the district court erred by failing to inquire into whether this is an "appropriate case" in which the "qualified" privilege is overcome. *In re Certain Complaints*, 783 F.2d at 1521.

Respectfully submitted this 23rd day of July, 2024.

/s/ Jeremy D. Cutting
Jeremy D. Cutting
Sumayya Saleh
Jeffrey D. Stein
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Phone: (202) 894-6132
cody@civilrightscorps.org

Elizabeth R. Cruikshank
Mary B. McCord
William Powell
Seth Wayne
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY AND PROTECTION
GEORGETOWN UNIVERSITY
    LAW CENTER
600 New Jersey Ave. NW
Washington, D.C. 20001
Phone: (202) 662-9042
erc56@georgetown.edu

Howard M. Shapiro
Matthew Martens
Sonika Data
Britany Riley-Swanbeck
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Phone: (202) 663-6487
howard.shapiro@wilmerhale.com

Robert Boone
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Phone: (212) 230-8800
robert.boone@wilmerhale.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a). This brief contains 12,329 words, excluding the parts of the document exempted by Rule 32(f), and was prepared in fourteen-point Garamond font, a proportionally spaced typeface, using Microsoft Word.

/s/ Jeremy D. Cutting
Jeremy D. Cutting
Counsel for Plaintiffs-Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Jeremy D. Cutting
Jeremy D. Cutting
Counsel for Plaintiffs-Appellants